TurNey, J.,
delivered the opinion of the Court.
In 1836 or 1837, James C. Snell became entitled to legacies and distributive shares from the estate of his maternal grand parents, John and Jane Lawrence.
William Snell, the father of James C. who was then quite young, not more than 'four or five years of age, became his guardian, and took charge of his estate, consisting of money, land and negroes.
James C. Snell was the only child of a first marriage. By a second marriage, Wm. Snell had two children, who are defendants to this suit. Wm. Snell died in March 1862, and James C. in March, 1863, leaving his widow, Melissa, and two children, who are the complainants.
On the 2d of January, 1852, Wm. Snell perfected a a purchase of a tract of land of 206 acres, known in the record as the Eeatherston tract, at the price of $3,600, taking the deed to himself.
*84 A bill is filed by the widow and children of James C. against the children of the second marriage of ¥m, Snell, alleging that the tract of land was purchased with the money of James C., in the hands of his father, as guardian; and that he, in his lifetime, held, and defendants since his death hold, the land in trust for James C., or his widow and children, after him.
The answer denies that the purchase was made with the means of James C. It is insisted that the guardian fully paid off his ward, and gave him the land as an advancement; that is, that about $1,791 of James’ money went into the purchase, and as to the balance of the purchase money, the land was an advancement.
It is also insisted for defendants, that William fully settled with and paid his son and ward; and in support of this, two receipts are produced, one in the words:
“^Received from William Snell, my guardian, eight hundred and fifty-three dollars and eighty-seven cents, in full of the amount due me on settlement on the 13th day of April, 1850; also, all accruing interest to this date. This, 5th day of March, 1856.
“[Signed] J. C. SNell.”
The other in the words:
“Received of William Snell all dues, debts and demands against him up to this date. November 17, 1861.
“[Signed] Jas. C. SNELL.”
To support the idea of settlement and discharge, the following paper is relied upon:
“Received of Jas. C. Snell all debts, dues and demands against him up to this date. November 17, 1861.
“[Signed] Wm. Swell.”
*85 As additional evidence upon this point, our attention is invited to a paper, without date or signature by subscription, but in the handwriting of James C. Snell, in these words:
“I, James C.'Snell, have this day given up to William Snéll' all my claims, as guardian,' from my grandfather and grandmother Lawrence’s, deceased, estate; and .the said William Snell has proceeded to value his estate, and give to James C. Snell one-third of his lands and negroes: Featherston place, 206 acres, at $30 per acre, $6,180; .Charles, $1,000; Amy, $800; Davy, $1,000; Tom, $800; Margaret, $600; Ruth, $600; John, $450. The above land and negroes amount to $11,430, besides other plunder, which property, I, James C. Snell, have received in my possession, and Wm. Snell keeps the balance to himself. The home place, 347 acres, at $30 per acre, amounts to $10,410; Hoover place, at $5,000; Gabriel, $600; Csesar, $1,000; Jim, $1,000; Abram, $1,000; Peter $1,000; Henry, $900; Bess, $800; Elizabeth, $800; Evaline, $800; Viney, $800; Jane, $600; Sarah, $700; Harriet, $500; Betty and Andrew, $500.”
To meet these evidences, complainant insists, and it is conceded in argument by defendants, that William' never paid any money to James C., but that the discharge was in the price of the land; the one insisting upon the full amount, and the other, that it was only partial and that the remainder of the investment in the land, after the extinguishment of the guardian’s indebtedness, was an advancement by the father to the son.
This issue brings us to the consideration, first, of the two receipts from James to his father, and the one from *86 his father to James, to ascertain their relation and purpose, to and in the matter between the parties. In doing this, it must be borne in mind that the land was purchased in January, 1852, and taken possession of by James in 1855, and his receipt for “eight hundred and fifty-three dollars and all accruing interest,” was executed 5th March, 1856.
It is clear, that at this date father and son came together to settle the matter of guardianship, that they canvassed the items in general terms, and it was then and there agreed that the land should discharge the liability of the guardian. The record shows that the father was not dishonest, but loose in the keeping of his accounts; and it is almost positively certain that they intended the general receipt to embrace by intendment, the entire transaction and accountability for the guardianship, the land being the payment. The failure to show the amount of accruing interest, proves that the parties were willing to and did settle in general terms, deeming it at that time, only necessary to show upon paper an acquittance of the amount and interest mentioned, that being the, amount shown by a settlement in the County Court, and being the only item existing in record or written evidence; all others, existing only in memory and parol, were deemed to be sufficiently adjusted by a parol understanding. This view is well supported by the proof of the very affectionate and confiding relations always and uninterruptedly existing between the father and the son.
We consider together, the mutual receipts of Nov. 17, 1861. .They are identical in language, for “all debts, *87 dues and demands to date,” not indicating any amount nor referring to any particular dealings.
At the time of their execution, James C. was preparing to, and in a short time did, enter the- army, leaving a family. It was doubtless his purpose, as also his father’s, to close up the matters of guardianship and the payment for the land in general terms, and by these mutual receipts.
There can be no other interpretation of these receipts; and unless this is so, there is no reason for the receipt given to James. The land is the only account on which he was or could be regarded as indebted to his father.
In support of this solution we recur to the facts, that the purchase price of the land was $3,600, and that the indebtedness in money actually received by William Snell was, according to his own showing, $1,791 in 1852, the date of the purchase.
James had acquired, in addition to this sum, a negro woman, who had become the mother of quite a number of children. His father kept and claimed her, and several of her children, as his own property, it is said, under a swap to James of a man and woman. The proof shows, however, that James’ negroes were worth about sixteen hundred dollars more than those he got in exchange. Without interest on this last amount, we are within two or three hundred dollars of the price paid for the land by the father.
Taking the calculation, with the general language of the receipts already mentioned, and the frequent declarations of the father, that he had bought- the land for James, and with his means, the conclusion is inevitable *88 that the settlements between the father and son, were for the single purpose of paying and receiving the land in discharge of the guardian account, and in consummation of the father’s purpose in its original purchase.
The only solution to be given to the paper without date and unsubscribed, is, that, at a time anterior to the making of the mutual receipts of November, 1861, propositions of settlement had passed between the parties without acceptance; and this paper is a memorandum of an offer to settle, which was never accepted.
We have the more readily and satisfactorily arrived at a conclusion, because of the ages and twofold relationship of the parties. While it is a general principle that it must be clearly established that the property upon which the trust is sought to be fastened, has been paid for out of the specific trust fund, the same measure and strictness of proof is not required in all cases. A distinction must be made between the cases in which the partied deal upon an equality, and cases growing out of the relation of parent and child, guardian and ward, and the like.
If the father, or his estate, has sustained a loss, it is such as has been brought about by his own conduct, and of which he cannot complain. It was his duty to have kept them truly, and to have made regular settlements of his guardian accounts. In this litigation, the burden was upon him to have explained each .difficulty, and failing to do so, he must suffer the loss.
For these reasons, we declare the title to the Feath-erston tract of land to have been in Win. Snell, in trust for James C. The title thereto will be divested out of *89 the beirs of William, and vested in those of James C. The cause will be remanded, for assignment of dower to the widow of James C. The decree of the Chancellor, directing an account to ascertain the amount paid, by Wm. Snell out of his individual 'means, in the purchase, is reversed.
It is objected, that the allegations of the bill are not broad enough for the relief sought. Looking to the bill and answers together, we think the objection is not well taken.